O

# United States District Court
# Central District of California

| | |
|---|---|
| MEDASSETS NET REVENUE SYSETMS, LLC, | Case No. 2:13-cv-01936-ODW(AGRx) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART MEDASSETS NET REVENUE SYSTEMS, LLC'S MOTION FOR SUMMARY JUDGMENT [38]** |
| v. | |
| DOWNEY REGIONAL MEDICAL CENTER; DOES 1–10, inclusive, | |
| Defendants. | |
| DOWNEY REGIONAL MEDICAL CENTER, | |
| Counterclaimant, | |
| MEDASSETS NET REVENUE SYSETMS, LLC, | |
| Counterdefendant. | |

## I.    INTRODUCTION

After emerging from bankruptcy, Defendant Downey Regional Medical Center ("DRMC") enlisted the services of Plaintiff MedAssets Net Revenue Systems, LLC to manage the hospital's revenue cycle.   The parties entered into several written agreements providing that MedAssets would submit final bills from DRMC to various

public and private payors and then follow up on any claims denials.   But their relationship soured after DRMC discovered that MedAssets employees were allegedly using "manual contractual adjustments" to write off otherwise legitimate amounts owed to DRMC—thus obviating the need for MedAssets to challenge any denials.   In February and March 2013, each party sent letters to the other resulting in the termination of the parties' agreement.

MedAssets filed this action, claiming that DRMC breached their contract by failing to pay for services performed.   DRMC counterclaimed for, among others, breach of contract and the implied covenant of good faith and fair dealing; equitable estoppel; and conversion.   MedAssets subsequently moved for partial summary judgment.   After considering the parties' arguments, the Court finds that DRMC's equitable-estoppel and conversion claims fail as a matter of Delaware law and that genuine disputes of material fact precludes summary judgment on the breach claims and counterclaims.   The Court accordingly **GRANTS IN PART** MedAssets's Motion.[1]

## II.   FACTUAL BACKGROUND

DRMC is a medical and surgical hospital located in Downey, California. (SUF 2.)   MedAssets is a limited-liability company incorporated in Delaware that manages clients' revenue cycle from the "back office," that is, it collects the finalized bills, submits them to payors, and follows up on denied claims.   (Diamond Dep. 13:31–14:5.)

### 1.   *MedAssets begins managing DRMC's revenue cycle*

Prior to working with MedAssets, DRMC used a company called Cymetrix to provide billing services.   (King Dep. 23:1–11.)   In the middle of 2010, Edmund King, DRMC's Chief Financial Officer, contacted Greg Strobel, MedAssets's Senior Vice President of Revenue Cycle Solutions, to explore the two companies working

---

[1] After carefully considering the papers filed with respect to this Motion, the Court deems the matter appropriate for decision without oral argument.   Fed. R. Civ. P. 78; L.R. 7-15.

together.  (SUF 12.)  They explored MedAssets providing "hot back up services," meaning that MedAssets would connect directly to DRMC's computer systems and be instantly poised to take over billing and collections if DRMC chose to terminate its relationship with Cymetrix.  (SUF 16–17.)

On August 19, 2010, the parties began reviewing draft Statements of Work ("SOW") for their proposed agreement.  (SUF 18.)  These SOWs outlined the "hot back up plan" and "accounts receivable" services.  (*Id.*)  On September 1, 2010, Strobel emailed King a draft of the Master Agreement along with SOW 1 for "Hot Back Up Plan Services."  (SUF 21.)  Robert Fuller, DRMC's Executive Vice President and Chief Operating Officer, executed the Agreement at the end of September and backdated it to September 1, 2010.  (SUF 26.)

> Paragraph 9.1 of the Master Agreement provides in part,
>
> MedAssets represents and warrants that the Services provided hereunder: (i) will be performed in a professional manner; and, (ii) any Work provided hereunder will reasonably conform in all material respects to the specifications agreed to by the Parties in writing for a period of ninety (90) days following the completion of such Services.  DRMC may only notify MedAssets during such ninety (90) day period of any deficiency in the performance of the Services.  Notwithstanding the foregoing, DRMC's sole and exclusive remedy, and MedAssets' sole and exclusive liability, for a breach of the foregoing representations and warranties shall be: (i) the specific support services in the applicable SOW; (ii) repeating or reprocessing of the services by MedAssets, or a Participating Affiliate, at no additional charge; or (iii) termination pursuant to Section 10.

(Strople Dep. Ex. 1.)  The parties specifically defined "Services" as "the services to be provided by MedAssets to DRMC as set forth in any attached or subsequently executed Statement of Work."  (*Id.*)

On October 21, 2010, Strobel sent King a draft of SOW 2 for "Accounts Receivable Services."  (SUF 30.)  SOW 2 does not contain any new or different warranty or liability-limitation language.  (SUF 31; Strople Dep. Ex. 3.)  Rather, SOW 2 states at the top of the first page that "THE UNDERSIGNED PARTIES ACKNOWLEDGE AND AGREE THAT THIS SOW IS MADE PART OF THE MASTER AGREEMENT BETWEEN DOWNEY REGIONAL MEDICAL CENTER AND MEDASSETS NET REVENUE SYSTEMS, LLC DATED AS OF THE 1ST DAY OF SEPTEMBER, 2010."  (Strople Dep. Ex. 3.)  On December 17, 2010, Fuller signed SOW 2 on behalf of DRMC.  (*Id.*)

Under the Master Agreement, MedAssets received 2.25 percent of the dollars it collected as a fee for its revenue-collection services.  (Fuller Dep. 52:18–53:6, Ex. 3.)  SOW 2 also provides that MedAssets would receive a quarterly bonus equal to an additional 0.25 percent if it met the collection goal provided in the SOW.  (Fuller Dep. 52:18–53:6, Ex. 3.)  MedAssets received this bonus in all but the first quarter it provided collection services for DRMC.  (Zulla Decl. ¶¶ 4–5.)

2.     *The parties' business relationship*

Both parties devoted substantial resources to managing their relationship. DRMC hired Dean Correnti as its Revenue Cycle Manger to manage MedAssets's role in the hospital's revenue cycle.  (SUF 46.)  Correnti took charge of the Revenue Integrity Group, which analyzed the hospital's accounts receivable and Health Information Management Department's diagnostic revenue codes.  (Correnti Dep. 13:12–14:17.)  Revenue Integrity would check to make sure that the diagnostic revenue codes were billed correctly through the system and what was paid through MedAssets was correct.  (Correnti Dep. 14:22–15:9.)

MedAssets had 29 people working on the DRMC account, including Diane Diamond who worked on site in Downey.  (Zulla Dep. 17:4–9.; SUF 51.)  The two companies communicated every day.  (SUF 53.)

/ / /

Every Wednesday, representatives from all key DRMC departments gathered in a revenue-cycle meeting along with Diamond and other MedAssets employees appearing by phone.  (SUF 60–62.)  Caitlin Zulla, MedAssets's Senior Vice President of Operations, Revenue Cycle Services, would also attend the meeting if she was at DRMC on a Wednesday.  (SUF 64.)

When a payor such as an insurance company denied all or a portion of a claim, it sent MedAssets an explanation of benefits ("EOB") and a denial code.  (King Dep. 131:23–132:1.)  MedAssets was supposed to prepare a report with all of the denials.  (*Id.* at 132:1–3.)  But King disputes receiving these reports.  (*Id.* at 132:5–13.)

### 3. Collection issues arise

When a patient is admitted to DRMC, entries are made both into the patient's medical record and into the Patient Accounting System.  (*Id.* at 17:16–18:3.)  As DRMC employees provide treatment, they enter diagnostic revenue codes into the Patient Accounting System corresponding to certain gross charges for the services.  (SUF 67–68.)  When a patient is discharged, any additional revenue coding is completed, and the bill is released, or "dropped," from the Patient Accounting System for final calculation.  (SUF 70.)  The gross charges rarely if ever reflect the amount that DRMC actually expects a payor to reimburse.  (SUF 71.)  DRMC uses a Contract Management System to calculate an expected reimbursement based on rates from private contracts and public payors.  (SUF 72–74.)  MedAssets would then receive the final bill and submit it to the appropriate payor.  (SUF 75.)

While a payor would remit funds directly to DRMC, MedAssets received notice of the payment and would post the payment to DRMC's Patient Accounting System.  (SUF 76–77.)  If a payor disputed a portion of a bill, MedAssets would undertake follow-up work, including communicating with the payor.  (SUF 79–80.)  It might also determine that the reimbursement received was correct and that the Patient Accounting System had miscalculated the expected reimbursement.  (SUF 81.)

MedAssets would accordingly adjust that amount via a manual contractual adjustment. (Correnti Dep. 41:10–15.)

King contends that MedAssets used the manual contractual adjustments in lieu of bad-debt codes to effectively hide from DRMC the outstanding balances that MedAssets should have followed up on and collected from payors. (King Dep. 81:10–82:10.) So instead of writing off the denied portion of a bill as bad debt, i.e., money earned but not paid, MedAssets would adjust it as a billing error so that they did not have to challenge the denial. (*Id.* at 93:6–21.) Since there was no bad debt showing up, DRMC initially conducted no follow-up investigation of its own regarding the denials. (*Id.* at 93:23–94:9; Correnti Dep. 37:14–38:2.) As a result of this practice, the Patient Accounting System reflected a lower expected income rate— and thus ostensibly reduced the amount that MedAssets had to collect. (King Dep. 110:24–111:25.) This exacerbated the hospital's already jeopardized financial health.

In December 2012 or January 2013, DRMC discovered that MedAssets was making manual adjustments within a day or two of the bill dropping and then subsequently reducing a portion of the adjustment equal to the amount reimbursed by a payor. (*Id.*) King advised Zulla of one "unacceptable" instance where MedAssets wrote off a $13,000 debt. (SUF 92.)

In August 2012, DRMC had instituted a policy where MedAssets employees could not write off more than $5,000 at a time without approval. (*Id.* at 83:12–18.) But DRMC discovered that MedAssets employees were instead using multiple $5,000 adjustments to net an account down to a zero-dollar balance. (*Id.* at 83:12–18; Correnti Dep. 45:19–25.)

In February 2013, King dispatched Vid Shivaraman, a DRMC financial analyst, to review a group of approximately 1,000 accounts that reflected $5,000 manual contract adjustments. (Shivaraman Decl. ¶ 7.) Shivaramn discovered 1,080 instances of $5,000 adjustments totaling over $5,000,000. (King Dep. 117:3–18.)

But Zulla testified that MedAssets's employees made contractual adjustments in order to correct the erroneous expected-reimbursement calculations produced by DRMC's Contract Management System.  (Zulla Dep. 155:20–24.)  Diamond also does not believe that MedAssets employees were using manual adjustments to zero out patient-account balances.  (Diamond Dep. 108:17–25.)  Diamond reviewed about 30 accounts herself and did not find any inappropriate billing practices after comparing the payments with the payor contracts.  (*Id.* at 109:14–110:14.)

Zulla testified that the majority of manual contractual adjustments she reviewed were the result of Medicare outpatient claims that did not "net down" properly through DRMC's Contract Management System.  (Zulla Dep. 84:5–12.)  But Elizabeth Navarro, DRMC's Contracting Supervisor, testified that the "majority" of these Medicare claims did net down properly, though some required manual adjustments.  (Navarro Decl. ¶ 5.)  MedAssets also had to adjust expected reimbursements when DRMC registered a patient under the wrong insurance plan and for some outpatient procedures.  (SUF 84.)  In fact, after Navarro was put in charge of the Contract Management System, MedAssets advised her from time to time that the system was incorrectly calculating expected reimbursements.  (SUF 101.)

### 4.   *Master Agreement is terminated*

MedAssets asserts that it collected a total of $297,293,137 for DRMC during the course of its contract performance from December 2010 to March 1, 2013.  (Zulla Decl. ¶ 3, SUF 4.)  In contrast, it appears that DRMC contends that MedAssets only collected $285,040,354.66.  (Witham Decl. Ex. 1, at Interrogs. 14–15.)  On February 8, 2013, MedAssets sent DRMC a letter stating that the hospital was overdue in the amount of $1,985,068.79.  (Strople Dep. Ex. 9.)  DRMC never disputed the accuracy of that sum.  (King Dep. 164:10–17, SUF 9.)  MedAssets further stated that it "will terminate the Agreement on the thirtieth day following the date of this letter (March 10, 2013) should payment not be made immediately."  (Strople Dep. Ex. 9.)

/ / /

On March 1, 2013, Fuller sent MedAssets a letter giving "notice of MedAssets' material breaches of the Master Agreement dated September 1, 2010, and of each and every one of the Statements of Work/Amendments . . . entered into thereunder." (Strople Dep. Ex. 10.)  Fuller stated that the fees set forth in MedAssets's February 8, 2013 letter "were not in fact earned."  (*Id.*)  He advised MedAssets that "no work should be done by MedAssets pursuant to the SOWs on or after 7:30 pm EST today, March 1, 2013."  (*Id.*)  After setting forth DRMC's grievances, Fuller concluded that DRMC had "made a settled decision to request that [MedAssets] stop work and cooperate in allowing [DRMC] to bill and collect [its] accounts. . . . Accordingly, [DRMC had] proposed that [they] undertake a professional disengagement."  (*Id.*)

Under Paragraph 6 of the Master Agreement, "all Work prepared by MedAssets for DRMC shall be the property of DRMC."  (SUF 104.)  During the parties' relationship, if payors sent EOBs in paper format, MedAssets would receive them, scan them, and transmit them to DRMC's Document Management System. (SUF 109.)  If a payor sent EOB information electronically, MedAssets housed this information on its Summit system, to which DRMC disputes that it had access. (SUF 110.)  DRMC asserts that "Work" includes the receipts of claims, EOBs, remittance advice, and other payor correspondence that MedAssets received and that MedAssets refused to return "claims information" after the termination of the parties' contract.  (SUF 105–06.)

On March 18, 2013, MedAssets filed this action against DRMC, alleging breach-of-contract and related claims.  (ECF No. 1.)  DRMC counterclaimed for, among others, breach of contract, equitable estoppel, and conversion.  (ECF Nos. 13, 26.)  On March 10, 2014, MedAssets moved for partial summary judgment.  DRMC timely opposed.  That Motion is now before the Court for decision.

### III.   LEGAL STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c).  The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and identify specific facts through admissible evidence that show a genuine issue for trial.  *Id.*; Fed. R. Civ. P. 56(c).  Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

A genuine issue of material fact must be more than a scintilla of evidence, or evidence that is merely colorable or not significantly probative.  *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000).  A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968).  An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.  *Id.*  Where the moving and nonmoving parties' versions of events differ, courts are required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## IV.   DISCUSSION

MedAssets moves for partial summary judgment, arguing that DRMC cannot sustain its equitable-estoppel and conversion claims.  MedAssets also argues that it is entitled to judgment on its breach-of-contract claim, thus precluding DRMC's counterclaims for breach of contract and the implied covenant of good faith and fair dealing.  The Court finds that DRMC's equitable-estoppel and conversion claims fail as a matter of law but that genuine disputes of material fact preclude summary judgment on the contract claims.

### A.   Choice of law

Under the *Erie* doctrine, a federal court sitting in diversity must apply the choice-of-law rules of the state in which the court sits.  *Klaxon Co. v. Stentor Elec.*

*Mfg. Co.*, 313 U.S. 487, 496 (1941).  California courts employ the principles set forth in Restatement (Second) Conflict of Laws section 187 in determining whether to enforce a contract's choice-of-law provision, "which reflect a strong policy favoring enforcement of such provisions."  *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459, 464–65 (1992).  One of the parties' incorporation in the state whose law is chosen provides the requisite "substantial relationship" sufficient to validate the choice of law.  *Id.* at 467.

Paragraph 11.6 of the Master Agreement provides that it is to be governed by Delaware substantive law.  Since MedAssets was formed under Delaware law, the contract has a sufficient "substantial relationship" to the state such that Delaware substantive law applies to this action.

**B.    Liability limitation**

Paragraph 9.1 of the parties' Master Agreement—written by MedAssets's legal department—provides:

> MedAssets represents and warrants that the Services provided hereunder:
> (i) will be performed in a professional manner; and, (ii) any Work
> provided hereunder will reasonably conform in all material respects to
> the specifications agreed to by the Parties in writing for a period of ninety
> (90) days following the completion of such Services.  DRMC may only
> notify MedAssets during such ninety (90) day period of any deficiency in
> the performance of the Services.   Notwithstanding the foregoing,
> DRMC's sole and exclusive remedy, and MedAssets' sole and exclusive
> liability, for a breach of the foregoing representations and warranties
> shall be: (i) the specific support services in the applicable SOW;
> (ii) repeating or reprocessing of the services by MedAssets, or a
> Participating Affiliate, at no additional charge; or (iii) termination
> pursuant to Section 10.

(Strople Dep. Ex. 1.)  Additionally, Paragraph 9.3 states:

The maximum liability of MedAssets and the Participating Affiliates arising out of or related to this Agreement, regardless of legal theory **(WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL NOT EXCEED THE SUM OF FEES RECEIVED BY MEDASSETS OVER THE IMMEDIATLEY PRECEDING SIX (6) MONTHS FOR THE SPECIFIC SERVICES IN THE SOW WHICH GAVE RISE TO THE LIABILITY.**

(*Id.*)   MedAssets argues that Paragraph 9.3 precludes DRMC from obtaining any money damages, thus gutting DRMC's counterclaims for breach of contract and the implied covenant of good faith and fair dealing.  The Court disagrees.

Delaware courts typically enforce liability-limitation provisions that preclude various types of damages.  *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, No. CV 7471-VCP, 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013); *see also Yellow Book USA v. Sullivan*, No. CIV.A. 1999-02-046, 2003 WL 1848650, at *7 (Del. Com. Pl. Feb. 20, 2003); *Eisenmann Corp. v. Gen. Motors Corp.*, No. C.A.99C-07-260-WTQ, 2000 WL 140781, at *22 (Del. Super. Jan. 28, 2000); *Donegal Mut. Ins. Co. v. Tri-Plex Sec. Alarm Sys.*, 622 A.2d 1086, 1090 (Del. Super. 1992); *Woloshin v. Diamond State Tel. Co.*, 380 A.2d 982, 984–85 (Del. Ch. 1977).  As one court stated, "freedom of contract would suggest that parties to a contract should be entitled to draft agreements so as to avoid certain of the duties and liabilities that are normally part of a contractual relationship."  *eCommerce Indus.*, 2003 WL 1848650, at *7.

MedAssets contends that Paragraph 9.1 plainly limits DRMC's remedies for MedAssets's alleged breach for failing to perform services in a "professional manner" or providing work that did not "reasonably conform" to the parties' Agreement.  MedAssets therefore argues that DRMC may not obtain money damages for any breach—just support services, reprocessing, or termination of the Agreement.

DRMC disagrees, asserting that the parties narrowly drafted Paragraph 9.1 to only apply to claims "for a breach of the foregoing representations and warranties,"

but MedAssets now asks the Court to ignore the clear language and rewrite it to apply to any breach-of-contract claim.  Pointing to Paragraph 9.3, DRMC asserts that the parties specifically contemplated that money damages would be available for contract breaches.

Since it appears that both paragraphs of the Master Agreement purport to limit damages in different ways, the Court must interpret the language of the contract to determine which applies to this action.  The Delaware Supreme Court has recognized that contract interpretation is "purely a question of law."  *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).  A court must read the contract as a whole, endeavoring to avoid any internal inconsistencies.  *Bank of N.Y. Mellon v. Commerzbank Capital Funding Trust II*, 65 A.3d 539, 550 (Del. 2013).  Clear and unambiguous language should receive its "ordinary and usual meaning."  *Rhone-Poulenc Basic Chems.*, 616 A.2d at 1195.  But a "contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.  Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  *Id.* at 1196.

The parties agree that Paragraph 9.1 is not ambiguous; the Court agrees.  That provision applies to the "Services" MedAssets was to provide under the Master Agreement.  The parties specifically defined "Services" in Paragraph 1 of the Master Agreement as "the services to be provided by MedAssets to DRMC as set forth in any attached or subsequently executed Statement of Work."   (Strople Dep. Ex. 1.) Reading the contract as a whole, the warranties contained in Paragraph 9.1 therefore apply to all work MedAssets provided for DRMC, including the hot backup plan and accounts-receivable services.  That is, MedAssets had to perform its services in a "professional manner" and reasonably conform its services to the parties' agreed-upon specifications.  Despite DRMC's arguments to the contrary, it does not matter whether DRMC omitted Paragraph 9.1 from its breach-of-contract counterclaim; DRMC may

not avoid the parties' unambiguous "Services" definition by simply relying on one portion of the contract while ignoring another.

Paragraph 9.3 is also consistent with 9.1.   While Paragraph 9.3 specifically mentions "CONTRACT" liability, it also states that MedAssets's "*maximum* liability" would be the sum of fees earned over the six-month period immediately preceding the breach.   (Strople Dep. Ex. 1 (emphasis added).)   Paragraph 9.3 thus establishes a liability ceiling whereby MedAssets could not possibly be liable for more than that amount of damages for any breach "arising out of or related to" the Agreement.

But as DRMC argues, Paragraph 9.1 is more specific—applying only to the specific situation involving MedAssets's breach of the "representations and warranties" contained in that paragraph.   Since the paragraph restricts liability even more than Paragraph 9.3, it simply falls below—and does not conflict—with the maximum-liability ceiling established in Paragraph 9.3.

MedAssets is therefore correct that Paragraph 9.1 limits DRMC's potential breach-of-contract recovery in this action.   But MedAssets is not correct that the provision eliminates the damages element of DRMC's counterclaims for breach of contract and the implied covenant of good faith and fair dealing.   Paragraph 9.1 is a liability-limitation provision—not an exculpation clause.   MedAssets remains potentially liable for DRMC's counterclaims, though just not for monetary damages. The Court accordingly **DENIES** MedAssets's Motion on this ground to the extent that it seeks to preclude DRMC's first and second counterclaims for breach of contract and the implied covenant of good faith and fair dealing, respectively.

## C.   Equitable-estoppel counterclaim

In its Amended Answer, DRMC included both an equitable-estoppel affirmative defense and counterclaim.   MedAssets now moves for summary judgment on those issues.   Both parties heavily dispute whether DRMC has satisfied the elements of equitable estoppel.   But the Court finds that Delaware law preempts their entire discussion.

Delaware defines equitable estoppel as "a judicial remedy by which a party may be precluded by its own act or omission from asserting a right to which it otherwise would have been entitled . . . ." *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 12 (Del. 2000) (internal quotation marks omitted).   The essence of equitable estoppel is preventing fraud, whether actual or constructive.   *Scott-Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 318 (Del. Super. 1973); *see also Wilson v. Am. Ins. Co.*, 209 A.2d 902, 903–04 (Del. Super. 1965) ("An estoppel may arise when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment.").

A party seeking to equitably estop another must establish four elements:

> (1) Conduct by the party to be estopped which amounts to a false representation, concealment of material facts, or which is calculated to convey an impression different from, and inconsistent with, that which the party subsequently attempts to assert; (2) knowledge, actual or constructive, of the real facts and the other party's lack of knowledge and the means of discovering the truth; (3) the intention of [*sic*] expectation that the conduct shall be acted upon by, or influence, the other party and good faith reliance by the other; and (4) action or forbearance by the other party amounting to a change of status to his detriment.

*Scott-Douglas Corp.*, 304 A.2d at 318.

MedAssets argues that DRMC's equitable-estoppel claim fails because it only operates as an affirmative defense—not a claim.   MedAssets also contends that it is "undisputed" that DRMC possessed the means to ascertain whether MedAssets had collected reimbursements from payors in amounts to which DRMC was entitled under its contracts with private insurers or under payment rules for government programs. DRMC admitted that it possessed the ability to calculate whether it had received the appropriate amount from payors within a few days.   DRMC also actually reviewed MedAssets's work in several ways, including employing Correnti and others to

analyze patient accounts through DRMC's Revenue Integrity Group, receiving and reviewing periodic reports from MedAssets, and having Navarro and Shivaraman audit claims billed by MedAssets.

But DRMC hotly disputes whether it had access to all relevant information necessary to discover MedAssets's alleged breaches, whether it had the capacity to discover the deficient billing, and whether MedAssets concealed its conduct such as manual contractual adjustments.  DRMC points out that one MedAssets manager testified that he thought that account notes did not automatically flow to DRMC, thereby not allowing DRMC to properly review MedAssets's work.  DRMC also repeatedly complained about its lack of access to MedAssets's systems and payor denials.  DRMC further contends that it did not have the capacity to adequately review the thousands of claims handled by MedAssets and that MedAssets concealed its breaches through tactics such as using multiple $5,000 manual contractual adjustments.

The problem with both parties' arguments is that they misapprehend the nature of equitable estoppel.  In *Genencor International*—a case cited but not analyzed by either party—the Delaware Supreme Court decided a case legally analogous to this action.  In that case, Genencor International and Novo Nordisk settled patent-infringement litigation through a license agreement.  766 A.2d at 9–10.  Genencor received a license to develop two products using five unpublished patents of Novo Nordisk, but it also received the right to develop the second product with an additional unpublished patent.  *Id.* at 10.  The agreement contained a representation and warranty that the five unpublished patents were the "only" unpublished patents that Novo Nordisk needed to disclose.  *Id.*

Novo Nordisk then discovered that it had inadvertently omitted an unpublished patent from the list of five unpublished patents and proposed that the parties include it only with respect to the second product.  *Id.*  Genencor disagreed, arguing that

/ / /

Genencor should be estopped from asserting the omitted patent against either licensed product. *Id.* at 10–11.

The Chancery Court held that Novo Nordisk breached the license agreement by omitting the sixth unpublished patent but granted estoppel only as a remedy with respect to the first product. *Id.* at 11. On appeal, the Delaware Supreme Court rejected the notion that Genencor was seeking equitable estoppel. The court stated,

> [I]t is important to consider that Genencor is seeking to enforce a contract supported by valid consideration. Since Genencor bargained for the representation that there were only five unpublished patents, there is no need to look for detrimental reliance as a "consideration substitute." We have previously observed that a promissory estoppel analysis is not applicable to cases in which the alleged promise is supported by consideration. We think this observation also applies to equitable estoppel. Therefore, because this is a dispute about enforcement of a bargained-for contract right, we conclude that the remedy Genencor seeks is not equitable estoppel.

*Id.* at 12 (footnotes omitted); *see also* 31 C.J.S. Estoppel and Waiver § 209 ("Equitable estoppel is inapplicable when the parties are bound by an express contract."); 28 Am. Jur. 2d Estoppel and Waiver § 26 (same). The court went on to observe that the issue was really whether the Chancery Court properly denied estoppel as a remedy for Novo Nordisk's breach. *Id.* at 13. Turning to familiar contract-interpretation principles, the court held that estoppel would not be an appropriate remedy, because it would have expanded Genencor's rights to develop the first product beyond what the parties intended. *Id.* at 14.

DRMC's estoppel "claim" similarly sounds in breach of contract—not true equitable estoppel. That is, DRMC contends that by MedAssets allegedly using manual contract adjustments to write down the amounts payors owed to DRMC, MedAssets breached the parties' Agreement by not performing its revenue-collection

services according to the parties' specifications.  As a result of this alleged breach, DRMC wishes to preclude MedAssets from benefiting from the Master Agreement's liability-limitation provision—or, put another way, DRMC wants to estop MedAssets from asserting the liability limitation in its favor as a remedy for the breach.

But it is well settled that a party may not use equitable estoppel as a sword "to work a positive gain."  28 Am. Jur. 2d Estoppel and Waiver § 30.  DRMC may therefore not increase its rights under the contract by attempting to equitably estop MedAssets from asserting paragraph 9.1's liability limitation.  Neither party disputes the Master Agreement's validity.  The parties are bound by an enforceable contract negotiated at arm's length.  Fuller, DRMC's Chief Operating Officer and a lawyer himself, negotiated the contract on DRMC's behalf.  There is no indication that MedAssets worked some sort of fraud on the hospital in drafting the Agreement.  DRMC may not circumvent the agreed-upon terms at this point simply because MedAssets may have breached.

The Court accordingly finds that DRMC's equitable-estoppel counterclaim fails as a matter of law and **GRANTS** summary judgment in MedAssets's favor on this ground.

**D.     Breach of contract and the implied covenant of good faith and fair dealing**

MedAssets also requests that the Court grant summary judgment in MedAssets's favor on its breach-of-contract claim, contending that DRMC breached the parties' Agreement by failing to pay for services rendered and terminating the Agreement without providing MedAssets with notice of the breach and an opportunity to cure.

Under Delaware law, "the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages." *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005), *aff'd,* 886 A.2d 1278 (Del. 2005).  A material breach by one party excuses the other party's counterperformance.  *BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268,

278 (Del. Ch. 2003). Delaware courts consider the elements set forth in Restatement (Second) of Contracts section 241 in determining whether a breach is material, thus discharging the other party's performance obligations. *Id.*

MedAssets argues that there is no dispute that DRMC breached the Master Agreement and SOWs by failing to pay for services rendered and terminating the Agreements without providing MedAssets with notice of breach and an opportunity to cure. MedAssets points out that paragraph 10 of the Master Agreement provides that "the non-breaching Party shall provide written notice of such breach to the other Party and the breaching Party shall have thirty (30) days to cure the breach as provided herein." (Strople Dep. Ex. 1.) DRMC also never contested the $1,985,068.79 amount that MedAssets notified DRMC was past due. MedAssets alleges that DRMC now owes $2,257,227.98. Finally, MedAssets contends that DRMC cannot pursue its breach counterclaims, because the liability-limitation provision in paragraph 9.1 eliminates the damages element of those claims—a prerequisite to relief.

In contrast, DRMC contends that MedAssets terminated the contract through its impossible-to-comply-with February 8, 2013 demand letter. DRMC argues that both parties knew that the hospital could not pay $1,985.068.79 within 30 days of the date of that letter, so the letter effectively served as a termination. In the alternative, DRMC asserts that the letter constituted an anticipatory repudiation, thereby justifying DRMC's nonperformance.

The parties have argued several different bases for breach of contract by the other party. But the Court cannot consider each in isolation; the timeline of events is crucial in a breach-of-contract action like this one. One must focus on which party breached first and whether that breach was material—thus entitling the other party to discharge its counterperformance.

The first action that could possibly constitute a breach of the Agreement here was MedAssets allegedly providing subpar billing and collection services. Under at least the Master Agreement and SOW 2, MedAssets had an obligation to submit the

final bills to the payors, collect the reimbursements, post them to DRMC's Patient Accounting System, and then follow up on the denials.  In turn, DRMC had to pay MedAssets a percentage of the funds collected.

But the parties hotly dispute whether MedAssets held up its end of the bargain. The parties agree that MedAssets would have to make manual contractual adjustments on occasion to correct expected-reimbursement miscalculations by the Contract Management System.  But DRMC argues that MedAssets was given an inch but took a mile with the manual adjustments—ultimately making manual contractual adjustments just a day or two after the bill dropped and using multiple $5,000 adjustments to circumvent the system limits.  DRMC also asserts that instead of conducting any follow-up work on payor denials, MedAssets employees simply adjusted the bills down to zero and then corrected the adjustments accordingly after a payor reimbursed all or part of a claim.  No one disputes that if these allegations are true, MedAssets would be in breach of its contractual obligations.

MedAssets disagrees with DRMC's contractual-adjustment allegations.  It contends that its employees only adjusted bills when the Contract Management System miscalculated an expected reimbursement, DRMC employees listed the wrong insurer, or for certain outpatient services.  Diamond's own investigation confirmed this argument.  MedAssets further denies using the manual corrections to obviate its billing and follow-up obligations.

This factual dispute is material to MedAssets's breach-of-contract claim and DRMC's counterclaim.  If MedAssets did breach its revenue-management obligations, then DRMC would not be responsible for paying for that substandard work; that is, MedAssets's material breach would discharge DRMC's counterperformance.  One also cannot weigh in on which party terminated the Agreement first until one determines who, if anyone, breached the Agreement prior to termination.

In light of this factual dispute, the Court **DENIES** MedAssets's Motion on the parties' breach claims and counterclaims.

**E.      Conversion counterclaim**

Finally, MedAssets argues that DRMC's conversion counterclaim fails because it has not alleged that MedAssets breached a duty independent from the contract and because Delaware does not recognize conversion of intangible property.

Under Delaware law, conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it." *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933).  In *Kudora v. SPJS Holdings, LLC*, 971 A.2d 872 (Del. Ch. 2009), the Chancery Court held that a plaintiff must establish "that the defendant violated an independent legal duty, apart from the duty imposed by contract."  *Id.* at 889.  Delaware also generally only permits conversion claims dealing with tangible property or intangible property merged into a tangible form.  *Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 439 (D. Del. 1999); *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, No. 13950, 1995 WL 694397, at *16 (Del. Ch. Nov. 21, 1995).

MedAssets contends that since DRMC alleges that it owns the EOB information as a result of the Master Agreement, DRMC has not alleged that MedAssets violated any duty independent of contract law sufficient to sustain the conversion claim. MedAssets also argues that electronic-claims information may not properly be the subject of conversion under Delaware law, because it is not tangible.

But DRMC contends that its "rights" to patient records relating to the payment of claims arise not from the contract but from federal law.  DRMC points out that the parties entered into a Business Associate Agreement in Schedule 1 to the Master Agreement as required by 45 C.F.R. § 164.502(e)(2).  DRMC asserts that as a business associate, MedAssets had an independent duty to return DRMC's patient records at the termination of the contract under 45 C.F.R. § 164.504(e)(2)(ii)(I), a Health Insurance Portability and Accountability Act ("HIPAA") regulation.  Finally, DRMC argues that Delaware courts have permitted conversion claims for electronically stored information.

DRMC's arguments with respect to its "rights" to patient information do little to sustain its counterclaim. The inquiry is not whether DRMC has a right to the information but rather whether MedAssets had an independent duty to return it. In a sense, DRMC is irrelevant to the analysis; one must instead look solely to MedAssets and its actions—that is, whether it violated some provision other than contract law when it allegedly refused to return the data.

The Court finds that DRMC has not established that MedAssets breached any duty independent of the parties' contract. Section 164.502(e)(2) of the HIPPA regulations provides that covered entities must document certain "satisfactory assurances" with a business associate in a written agreement that complies with § 164.504(e). The cited regulation states, among other things, that the business associate must, "if feasible, return or destroy all protected health information received from, or created or received by the business associate on behalf of, the covered entity that the business associate still maintains in any form." § 164.504(e)(2)(ii)(I). But HIPPA does not create an independent duty. Rather, § 164.504(e) sets forth assurances that covered entities must include in a written contract. A breach of those assurances accordingly is a breach of the contract—not independent of it. Since DRMC has not established that MedAssets owed any other duty to return the electronic-claims information, its conversion claim fails as a matter of law.

As DRMC points out, some Delaware courts have permitted conversion claims relating to electronically stored information. *Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, No. CIV.A. 7866-VCP, 2014 WL 897223, at *23 (Del. Ch. Mar. 5, 2014) (citing *Seibold v. Camulos Partners LP*, No. CIV.A. 5176-CS, 2012 WL 4076182, at *22 (Del. Ch. Sept. 17, 2012)). It therefore would not be appropriate for this Court to find that the conversion claim failed because the information is intangible.

/ / /

/ / /

# V.    CONCLUSION

For the reasons discussed above, the Court **GRANTS** MedAssets's Motion with respect to DRMC's equitable-estoppel and conversion claims and **DENIES** the Motion on all other grounds.

**IT IS SO ORDERED.**

April 22, 2014

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**